UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| L.W. and J.P., *Individually and as* | ) | |
| *Co-Guardians of John Doe*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02397-JMS-MJD |
| | ) | |
| Roman Catholic Archdiocese of | ) | |
| Indianapolis, Inc. and Roncalli High School, | ) | |
| Inc., | ) | |
| *Defendants*. | ) | |

**ORDER**

Plaintiffs L.W. and J.P. are co-guardians of John Doe, an eighteen-year-old incapacitated adult with physical and mental impairments. John Doe attended school at Defendant Roncalli High School, Inc. ("Roncalli"), a religious school operated by Defendant Roman Catholic Archdiocese of Indianapolis, Inc. ("the Archdiocese"). In the fall of 2019, while John Doe was a student at Roncalli and an equipment manager for the football team, two incidents occurred where John Doe alleges varsity football players bullied and sexually harassed him. L.W. and J.P. bring this action individually and as co-guardians of John Doe, alleging claims against Roncalli and the Archdiocese related to their response to the harassment and bullying John Doe alleges he experienced. Specifically, they allege that Defendants violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("the Rehabilitation Act") and Title IX, 20 U.S.C. § 1681, *et seq.* ("Title IX"). [Filing No. 48.] Plaintiffs also allege negligence claims against Defendants. [Filing No. 48.] Roncalli and the Archdiocese have filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), seeking dismissal of all of Plaintiffs' claims. [Filing No. 50.] That motion is now ripe for the Court's review.

1

# I.
## STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a claim that does not state a right to relief.  The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019).  A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).  This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

# II.
## BACKGROUND

The following are the factual allegations contained in the Second Amended Complaint, [Filing No. 48], the operative complaint in this case, which the Court must accept as true at this time.  The Court also sets forth and considers Plaintiffs' allegations contained in their response to

Defendants' Notice of Supplemental Authorities Supporting Defendants' Third Motion to Dismiss. [Filing No. 69.]  The Court may consider these allegations, which Plaintiffs discovered after filing the Second Amended Complaint, as long as they are consistent with the allegations in the Second Amended Complaint – and the Court finds that they are.  *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A plaintiff…has much more flexibility in opposing a Rule 12(b)(6) motion [and] may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings."); *Help at Home Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 752 (7th Cir. 2001) ("A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint.") (quotation and citation omitted).

### A.     Roncalli's Policies and Procedures

For the 2019-2020 school year, one of Roncalli's stated purposes as set forth in the Roncalli Student Handbook was for graduates to honor and glorify God through "DIGNITY – recognizing that every person is created in the image and likeness of God, having the utmost respect for life, and embracing a diverse world."  [Filing No. 48 at 3.]  Roncalli offered a "STARS-Special Education Services Program" ("STARS") for students with intellectual or learning disabilities. [Filing No. 48 at 3.]  The program was designed so "[a]ll students can succeed when provided with the right atmosphere to meet their needs.  It is our job as teachers and parents to provide an atmosphere that will assist students to reach their potential and realize their God given talents." [Filing No. 48 at 3-4.]

The goals for STARS included:

- Identify and meet the needs of individual students;

- Assist teachers to develop and monitor specific behavioral intervention plans;

- Educate staff, faculty, and [the] student body on learning differences;

- Provide in-service opportunities for teachers regarding best practices, differentiation strategies and disability awareness;

- Provide STARS students with necessary skills to live an independent and productive life after high school; and

- Include STARS…students in extracurricular activities/campus life.

[Filing No. 48 at 4.]

Roncalli had numerous policies in place related to student behavior, including the following most relevant policies:

**11.3  Child Abuse Reporting**

In accordance with the Safe and Sacred policies of the [A]rchdiocese of Indianapolis and Indiana law, any report or suspicion of child abuse and/or neglect will be reported to the appropriate authorities for their investigation.

**13.0  Code of Conduct**

Everyone at Roncalli is expected to show respect for themselves and those around them, as well as the material and physical surroundings which are provided. Each member of this school community has the right to grow and mature intellectually, physically, emotionally and spiritually. At the same time, each person has the responsibility to see that others' rights are respected and upheld. Language and behavior should contribute in a positive way to school life. Rules and regulations represent guidelines for behavior. It is impossible to write rules to cover all situations that may arise but the rules in existence are designed to enable all those at Roncalli to function harmoniously with each other. If everyone abides by the rules, we contribute to an environment in which persons can find experiences that will help them grow in meaningful ways. By breaking rules, a student infringes on another's rights, disrupts the community and often hurts him/herself in the process. If this happens, the offender must accept the consequences for what he/she did. At Roncalli, the consequences will take various forms, according to the degree of violation of the rules and of people's rights. Everyone makes mistakes. No one is perfect. The goal is that everyone learn[s] from mistakes and thus becomes an individual who makes an even better contribution to the total school community.

**13.1  Expectations**

Each student of a Catholic high school is to exemplify the highest behavior, that of being a Christian with all its implications. One of the essential purposes of a

Roncalli education is the formation of character. The rules of the school, designed for the purpose and in the interest of good order, are exercised with discretion and justice. Roncalli does not hold itself responsible for student offenses committed outside its jurisdiction; yet any conduct that is detrimental to the reputation of the school or that binds the advancement and moral good of the students in general is sufficient cause for suspension or expulsion. Roncalli High School prides itself on being a welcoming, Christian community. As such the behavior of our students should model this welcoming spirit at all times. Language and/or behavior that is racist, sexist, homophobic or ethnically degrading is not acceptable and would be grounds for disciplinary action.

## 14.11   Harassment/Bullying

Roncalli stands against harassment/bullying of any sort. For obvious reasons, both biblical and Catholic, harassment/bullying violates our mandate not only to love one another, but in all circumstances to accept one another despite our differences. When these violations are expressed openly in language or behavior, they are reprehensible. Roncalli will not allow behavior that mocks, diminishes or impugns the dignity or integrity of any person or group. No racist, sexist or homophobic expression, language or behavior will be tolerated.

**Harassment/bullying includes but is not limited to the following:**

1.   Verbal Harassment/bullying
2.   Physical Harassment/bullying
3.   Visual Harassment/bullying
4.   Sexual Harassment/bullying

Any incident of harassment/bullying/intimidation should be communicated to an administrator, counselor or social worker at Roncalli. All reports about harassment/bullying/intimidation will be taken seriously and investigated thoroughly. Any student found in violation of this policy will face serious disciplinary consequences up to and including expulsion. Any student filing false or frivolous charges or making frivolous accusations will face similar consequences.

NOTE: Roncalli recognizes that any form of harassment/bullying can take place through digital media including but not limited to e-mails, blogs, web sites, text messages, social media, etc.… Any incidents involving technology are subjected to the same punishments as if they had occurred in person.

## 14.13   Anti-Hazing Policy

In accordance with recommendations of the National Federation of High Schools (NFHS) and the Indiana High School Athletic Association (IHSAA), Roncalli High School has in place the following anti-hazing policy:

**Purpose:**  The purpose of this policy is to maintain a safe learning environment that is free from hazing for students and staff members.  Hazing activities of any type are inconsistent with the educational goals of Roncalli High School and are prohibited at all times.  This policy applies to hazing behavior that occurs on or off school property during and after school hours.

**General Statement of Policy:**  No student, teacher, administrator, or other school employee, or volunteer shall plan, direct, encourage, aid, engage in, permit, condone or tolerate hazing.  Roncalli High School will investigate all complaints of hazing and will discipline or take appropriate action against any student, teacher, administrator, or other school employee, or volunteer who is found to have violated this policy.  Upon completion of the investigation, Roncalli will take appropriate action.  Such action may include, but is not limited to, warning, suspension, remediation, termination or expulsion.

**Definition:**  "Hazing" means committing an act against a student, or coercing a student into committing an act, that creates a substantial risk of harm, embarrassment or humiliation, in order for the student to be initiated into or affiliated with a student organization, or for any other purpose.

**Reporting Procedures:**  Any person who believes he or she has been the victim of hazing or any person with knowledge or belief of conduct which may constitute hazing shall report the alleged acts immediately to an administrator, counselor or social worker at Roncalli.  Teachers, administrators, other school employees as well as volunteers shall be particularly alert to possible situations, circumstances or events that might include hazing.  Any such person who receives a report of, observes, or has other knowledge or belief of conduct which may constitute hazing shall inform an Administrator or the Dean of Students immediately.

**Reprisal:**  Roncalli will take appropriate action against any student, teacher, administrator or other school employee, or volunteer who retaliates against anyone who makes a good faith report of hazing, or who provides information, assists or participates in an investigation or hearing about a hazing incident.  Retaliation includes, but is not limited to, any form of intimidation, reprisal or harassment.

## 14.22   Technology/Internet Etiquette

Posting information in a social media and/or a public forum is the responsibility of the user.  If the school becomes aware that a student has posted something that is derogatory to themselves, other students, teachers, the school or others, or indicates that they are engaging in illegal or immoral activities or harassment of others, they will be subject to school discipline which could include suspension and/or expulsion from school.

**16.0-16.6    Disciplinary Action; Referral, Detention, Saturday School, Suspension, Probation, Exclusion**

At Roncalli, all regulations are designed to foster orderly operation of the school and mature development of the student.  All Roncalli students must realize that their conduct, no matter time or place, reflects both upon their personal dignity and the dignity of their fellow students.  Consequently, student conduct at any time not in keeping with the guidelines of the educational philosophy and objects of Roncalli High School is a discredit to the individual and to other students, faculty and administration.  Any conduct unbecoming a Roncalli student is considered a breach of discipline and exposes the student to the imposition of an appropriate penalty. Hence, it is the responsibility of each student to know and follow the guidelines set down herein.  The gravity of penalties will be determined by the seriousness of the offense and its attendant circumstances.

**16.7    Expulsion**

This is the final exclusion of a student from Roncalli High School.  A student may be expelled in a given case for a single offense depending upon the seriousness of the offense and attendant circumstances.  Students can also be expelled or denied readmission for cumulative acts or habitual failure to serve detentions.  Should the attitude of a student deteriorate to the point at which other students' opportunities are jeopardized, that student can be denied the privilege of continuing at Roncalli High School.  The length of expulsion is at the discretion of the administration.

Some types of conduct recognized as grounds for expulsion are (but not limited to):

- the use of violence, force, noise, coercion, threat, intimidation, fear, passive resistance or other comparable conduct to interfere with the school's purpose or urging others to such conduct.

- harassment and/or bullying.

- causing or attempting to cause physical injury to another person (not in self-defense).

- threatening or intimidating another student to obtain money or other valuables.

- failure to comply with directions given by teachers or other school personnel in a substantial number of instances.

- engaging in any activity forbidden by Indiana law.

- repeated violation of rules.

**19.8    Code of Conduct Statement**

The following Roncalli athletic rules are established in conjunction with the Indiana High School Athletic Association Constitution which states:

> "Contestants' conduct, in or out of school, shall be such as: 1) not to reflect discredit upon their school or the IHSAA or, 2) not to create a disruptive influence on the discipline, good order, moral or educational environment in a school.  It is recognized that Principals, by the administrative authority vested in them by their school corporation, may exclude such contestants from representing their school."

**19.9    Enforcement of the Code of Conduct**

The Principal (or designee) shall enforce all rules and regulations as described in the Code of Conduct for athletes.  All rules regarding behavior and/or training as outlined in IHSAA regulations apply.  The code will be reinforced by the coach of each sport during the year.  Any alleged violation of the Code shall be reported first to the Principal (or designee) and Athletic Director.

**19.10   Code of Conduct for Athletes**

Roncalli High School is not asking its athletes to make sacrifices.  Sacrifices imply giving up good things.  We are asking our athletes to do the opposite.  Live clean, think clean and do those things that allow each student athlete to have a positive influence on not only their own lives but also those of their team members.  All Roncalli athletes are expected to comply with the standards of our athletic code of conduct and school rules.

- The good of the team is first and foremost.  In sports where individuals can advance, after team elimination, he/she then becomes most important.  No player(s) will ever employ tactics in violation of rules to gain an undeserved advantage.

- All players will devote themselves to being a true student/athlete.

- Specific team rules may be set forth by the coach of each sport team.  These rules, and the penalties for breaking them, will be made known to the athletes and their parents by the coach at the parent meeting conducted at the beginning of that sport's season.

- All student athletes are expected to be in compliance with all other school rules outlined within this handbook.  Any athlete in violation of established Roncalli High School student rules such as truancy, suspension, classroom disruption, etc. will be disciplined according to those rules.

- Athletes shall conduct themselves as good citizens within the community.  The following disciplinary actions will be enforced:

Any athlete found by the administration to be involved in any form of disrespect, vandalism or theft are subject to the following:

- FIRST OFFENSE:  Will result in automatic suspension from the athletic team for 25% of the current/future season contests (Carry Over Rule)

- SECOND OFFENSE:  Suspension from athletics for one calendar year.

- THIRD OFFENSE:  Suspension from athletics for one calendar year.

- Any athlete charged with a misdemeanor offense may be subject to an athletic suspension for 25% of the current/future team season contests (Carry Over Rule).  This decision will be made by the administration pending an investigation of the incident.  A second or succeeding offense will result in athletic suspension for one calendar year from the date of the infraction.

- Any athlete charged with a felony offense will be suspended immediately from all athletic participation pending further investigation by school officials.

**NOTE:  The administration in conjunction with the discipline board have the right to levee harsher penalties including expulsion from school for any of the offenses to the Code of  Conduct for Athletes.**

[Filing No. 48 at 4-10.]

B.      **John Doe's Enrollment at Roncalli and Participation in the Football Program**

John Doe is an eighteen-year-old incapacitated adult male who resides with his mother, L.W., in Greenwood, Indiana.  [Filing No. 48 at 2.]  He has Trisomy 21 or Down Syndrome and, as a result, has physical and mental impairments that limit his ability to care for himself.  [Filing No. 48 at 2.]  His disability adversely affects his educational performance and he is eligible for special education and services related to his disability.  [Filing No. 48 at 2.]  John Doe takes prescription medication and receives ongoing medical treatment for Down Syndrome.  [Filing No. 48 at 2.]

9

During the 2019-2020 school year, John Doe was a student at Roncalli and was the Roncalli football team's equipment manager.  [Filing No. 48 at 2.]  John Doe looked up to, adored, and idolized the Roncalli varsity football players and loved participating in the Roncalli football program.  [Filing No. 48 at 11.]

### C.    Previous Incidents Involving L.M. and Defendants' Awareness of Those Incidents

L.M. is the son of Roncalli's varsity football coach for the 2019 season.  [Filing No. 69 at 2.]  In May 2018, L.M. coerced his 14-year-old female classmate at St. Barnabas Catholic School, an Archdiocese grade school, to send him nude photographs by threatening her.  [Filing No. 69 at 2.]  L.M. then disseminated those photographs and showed them to classmates.  [Filing No. 69 at 2.]  Defendants had actual notice of this misconduct.  [Filing No. 69 at 2.]

In May 2019, L.M. used Roncalli's email system and school-issued devices to threaten to rape his ex-girlfriend and had inappropriate pictures of her on his cell phone.  [Filing No. 69 at 2.]  Defendants also had actual notice of this misconduct.  [Filing No. 69 at 2.]  At that time, L.M.'s parents were notified that any other episodes of aggressive or inappropriate behavior toward anyone would put L.M. in grave danger of being expelled.  [Filing No. 69 at 2.]  On September 13, 16, 25, 26, and 27, 2019, Defendants were notified of L.M.'s continuing misconduct toward his ex-girlfriend by her mother.  [Filing No. 69 at 2.]

### D.    The September 9, 2019 Incident

On September 9, 2019, a Roncalli student and varsity football player used his smartphone to videotape John Doe's genitals (the "Video") while John Doe was urinating in the toilet at the "Blockhouse," which is the Roncalli football locker room (the "Video Incident").  [Filing No. 48 at 12.]  The student posted the Video to a social media platform.  [Filing No. 48 at 12.]  The student then showed the Video to other football players in front of John Doe, and they laughed at the

Video.  [Filing No. 48 at 12.]  John Doe did not consent to having his genitals videotaped or for the Video to posted to the internet.  [Filing No. 48 at 12.]

     **E.**       **Roncalli's Response to the Video Incident**

     John Doe told L.W. about the Video Incident on the evening of September 9, 2019, and L.W. immediately reported the Video Incident to a Roncalli staff member via email.  [Filing No. 48 at 12.]  The Roncalli staff member then notified Tim Crissman, Roncalli's Dean of Students, of the Video Incident.  [Filing No. 48 at 12.].  Dean Crissman met with the student who took the Video, but did not watch the Video and assisted the student in deleting the Video from the student's phone.  [Filing No. 48 at 13.]  The student received one after-school detention for the Video Incident, but was not barred from participating in any football-related practices, games, or events.  [Filing No. 48 at 13.]  Additionally, Roncalli did not institute any practices or accommodations related to protecting John Doe's safety, dignity, or personal autonomy while at school or in the Blockhouse.  [Filing No. 48 at 13.]

     Roncalli did not have a Title IX coordinator at the time of the Video Incident, and no Roncalli staff member contacted John Doe to discuss the Video Incident or offer support.  [Filing No. 48 at 13.]  There were no supportive measures available to John Doe and Roncalli did not give any consideration to John Doe's wishes regarding supportive measures after the Video Incident.  [Filing No. 48 at 13.]  Roncalli's staff also did not explain to John Doe the process for filing a formal complaint regarding the Video Incident.  [Filing No 48 at 13.]

     On September 20, 2019, L.W. and her husband met with Dean Crissman and one of John Doe's teachers to discuss the Video Incident.  [Filing No. 48 at 13.]  At the meeting, Dean Crissman admitted he did not watch the Video, even though he was required to do so.  [Filing No. 48 at 13.]  Dean Crissman asked for more time to investigate the matter further.  [Filing No. 48 at 13.]

On September 24, 2019, Dean Crissman informed L.W. that at least two other students had viewed the Video before it was deleted.  [Filing No. 48 at 13.]  Dean Crissman apologized to L.W. for not watching the Video before it was deleted.  [Filing No. 48 at 13.]  The students involved were not precluded from participating in any football-related practices, games, or events, nor were any measures taken to ensure John Doe's safety, dignity, or personal autonomy at school or in the Blockhouse.  [Filing No. 48 at 13.]

F.    **The September 27, 2019 Incident**

Roncalli administrators, teachers, support staff, and the football coaching staff knew that John Doe was previously bullied and sexually assaulted by members of the football team at the Blockhouse, but did not take reasonable measures to prevent it or to stop it from happening.  [Filing No. 48 at 14.]  On September 27, 2019, the night of the Roncalli homecoming football game, John Doe was again "bullied, abused, harassed, and hazed" in the Blockhouse by members of the varsity football team in retaliation for disclosing the Video Incident (the "Retaliation Incident").  [Filing No. 48 at 14.]  He was "verbally threatened, coerced, and forced to perform sexual, embarrassing and humiliating acts against his will as part of his affiliation with the Roncalli football program."  [Filing No. 48 at 14.]  The events were also filmed on a cell phone by a football team member, who subsequently deleted the footage.  [Filing No. 48 at 14.]

L.W. learned of the Retaliation Incident when she received an anonymous letter on October 2, 2019 which stated:

> I wanted to make you aware of an incident my son saw last Friday 9/27/2019. My son walked in to the [B]lockhouse and saw JOHN DOE licking and sucking [Varsity Football Player]'s nipples. His friends were laughing and encouraging him. There was another player nearby with his shirt off and looked like he was going to be next.
>
> My son fears he will be retaliated against for speaking up. I promised him I would not give his name—but I have reported this to the school. This behavior is

12

despicable—and should not be tolerated. It shouldn't matter that [L.M.] is the coach[']s son—and I fear the school may not hold him accountable for his bullying. That's why I wanted to make you aware as well.

[Filing No. 48 at 14.] John Doe confirmed that the Retaliation Incident took place and identified the students that were involved using the Roncalli yearbook. [Filing No. 48 at 14.]

The following day, October 3, 2019, L.W. filed a report with the Indianapolis Metropolitan Police Department regarding the Video Incident and the Retaliation Incident and kept John Doe home from school. [Filing No. 48 at 15.] Defendants had not reported the events to the police. [Filing No. 48 at 15.]

**G.  Defendants' Response to the Retaliation Incident**

On October 4, 2019, Dean Crissman left a voicemail for L.W. stating that Roncalli had become aware of an incident of John Doe "being treated with less respect than he deserved," and that they had investigated and determined that it did not occur. [Filing No. 48 at 15.] Dean Crissman did not provide details of the reported incident, and indicated that John Doe had been interviewed as part of the investigation. [Filing No. 48 at 15.] This was the first time that Roncalli notified L.W. of the Retaliation Incident. [Filing No. 48 at 15.] During the school's investigation into the Retaliation Incident, John Doe was interviewed without a parent or guardian present. [Filing No. 48 at 15.] Defendants also did not disclose the nature of the allegations to L.W. or J.P. at any time. [Filing No. 48 at 15.] Additionally, Defendants did not report the Retaliation Incident to the police or to the Department of Child Services, instead only conducting an internal investigation. [Filing No. 48 at 15.] During and after the investigation, no protections or accommodations were implemented to ensure John Doe's safety, dignity, or personal autonomy at school or in the Blockhouse. [Filing No. 48 at 15.]

On October 17, 2019, the Superintendent of Catholic Schools for the Archdiocese wrote a letter to Dean Crissman and Roncalli's Principal outlining her concerns that L.M. had "demonstrated a pattern of behavior that cannot be tolerated," including "sexting, passive aggressive behavior toward an ex-girlfriend, and a threat of rape." [Filing No. 69 at 2-3.] She noted that the Retaliation Incident was "clearly not the first or only issue of concern." [Filing No. 69 at 2-3.] She also stated that there was a "significant risk" in allowing L.M. to stay on the football team and remain at Roncalli, given his pattern of behavior. [Filing No. 69 at 3.] The Superintendent acknowledged that Roncalli was culpable, and asked Roncalli to ensure that there would be consistent supervision in the locker room, including having coaches present at all times "given their responsibility to ensure the safety of all students," noting that "such a practice is necessary." [Filing No. 69 at 3.] She stated that Roncalli's Principal "noted that specific expectations and plan (sic) should have been made for team managers to check in with an assistant coach" and that "in cases where a student with significant special needs is participating, this along with consistent monitoring is even more important." [Filing No. 69 at 3 (emphasis omitted).] The Superintendent also questioned whether the Victim Assistance Coordinator was ever contacted to serve as an advocate for John Doe and his family. [Filing No. 69 at 3.]

### H.     John Doe Withdraws From Roncalli and Subsequent Events

On October 7, 2019, L.W. notified Roncalli that she was withdrawing John Doe as a student. [Filing No. 48 at 15.] On October 8, 2019, John Doe provided an interview as part of the police investigation and voiced fear that the students involved in the Retaliation Incident would act on their threats and retaliate against him for reporting what had happened. [Filing No. 48 at 15.]

On October 14, 2019, L.M. transferred to another school and was allowed to continue playing football there. [Filing No. 48 at 16.] On October 21, 2019, L.W. received a second anonymous letter identifying two student athletes who could identify the students involved in the Retaliation Incident, including the student who had recorded the Retaliation Incident with a cell phone. [Filing No. 48 at 16.]

### I.   The Lawsuit

L.W. and J.P., individually and as co-guardians of John Doe, initiated this lawsuit on September 7, 2021 and in the Second Amended Complaint assert claims against Roncalli and the Archdiocese for: (1) violations of Section 504 of the Rehabilitation Act; (2) violations of Title IX; and (3) negligence and negligence *per se*. [Filing No. 48 at 18-24.] Defendants have moved to dismiss all of Plaintiffs' claims. [Filing No. 50.]

### III.
### DISCUSSION

Defendants argue that: (1) Plaintiffs' Rehabilitation Act and Title IX claims fail because they have not alleged that Defendants were deliberately indifferent to peer-on-peer harassment that John Doe experienced while a Roncalli student; (2) Plaintiffs' Title IX claim fails because they have not alleged that John Doe experienced discrimination or was harassed on the basis of his sex; and (3) in the absence of the federal claims, which should be dismissed with prejudice, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law negligence claims. [Filing No. 51 at 7-18.] The Court considers each argument in turn.

### A.   Whether Plaintiffs Have Adequately Alleged Rehabilitation Act and Title IX Claims Under the Deliberate Indifference Standard

Defendants argue that in order to succeed on a Title IX claim, Plaintiffs must show that Roncalli was "deliberately indifferent to harassment of which it had actual knowledge, that is so

severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." [Filing No. 51 at 8-9 (quotations and citations omitted).] Defendants contend that Plaintiffs have not alleged any action or inaction by the Archdiocese, "much less any action or inaction that could be regarded as clearly unreasonable." [Filing No. 51 at 10.] Defendants note that Plaintiffs do not allege that John Doe experienced harassment before the Video Incident, but do allege that Dean Crissman disciplined the student who took the video and that the student involved in the Retaliation Incident "was transferred to another school within two weeks of the incident coming to light." [Filing No. 51 at 10-11.] They argue that "there are no allegations that the events or students involved in the [Retaliation Incident] had any connection to the [Video Incident]." [Filing No. 51 at 11.] Defendants assert that Plaintiffs' allegations indicate that Dean Crissman communicated with L.W. at least three times from September 20 to October 4, 2019 to address L.W.'s concerns about John Doe's treatment by other students and "[t]hat is presumably a dialogue that would have continued had L.W. not decided to withdraw John Doe from Roncalli the very next business day after Dean Crissman called her to discuss the school's investigation of the [Retaliation Incident]." [Filing No. 51 at 11.] Defendants argue that L.W. did not ask or demand that Roncalli implement any particular protections or accommodations for John Doe to continue participating in the football program, and that L.W. allowed him to continue participating even after the Video Incident. [Filing No. 51 at 11.] Defendants rely on a Seventh Circuit Court of Appeals case – *Jauquet v. Green Bay Area Catholic Educ.*, 996 F.3d 802 (7th Cir. 2021) – in arguing that Plaintiffs have not alleged deliberate indifference on the part of Roncalli. [Filing No. 51 at 12-13.] Defendants also argue that an alleged failure to comply with internal policies is not sufficient to establish that Roncalli acted with deliberate indifference. [Filing No. 51 at 13-14.] Finally, Defendants attempt

16

to distinguish three district court cases from within the Seventh Circuit, which they claim involved "far more serious allegations of deliberate indifference to severe and pervasive harassment than anything alleged here." [Filing No. 51 at 14-16.]

In their response to the Motion to Dismiss, Plaintiffs argue that they have plausibly alleged that Defendants were deliberately indifferent in responding to both the Video Incident and the Retaliation Incident. [Filing No. 56 at 6-10.] Plaintiffs attempt to distinguish cases where the Seventh Circuit Court of Appeals found that deliberate indifference had not been adequately alleged, and note their allegations that Defendants failed to implement "a single preventative measure to protect John Doe from further harassment"; that this failure caused John Doe to be harassed again "weeks later, in the same place, in the same setting, by the same group of peers"; and that Dean Crissman "chose not to view available video footage of the first event and ordered its destruction." [Filing No. 56 at 8-9.] Plaintiffs point to their specific allegations relating to deliberate indifference, including:

- That Defendants failed to follow their own policies intended to address bullying, harassment, abuse, assault, discrimination, and hazing;

- Defendants' custom and practice of failing to train their employees on implementing and enforcing the policies amounted to an official policy;

- The Dean of Roncalli assisted the perpetrator of the abuse with deleting evidence of the hazing event;

- The student perpetrators were not precluded from participating in any football-related events and no protections or accommodations were made to ensure John Doe's safety at school or in the locker room;

- Defendants did not have a Title IX coordinator and no one contacted John Doe to discuss the [Video Incident] or to offer supportive measures. Defendants failed to explain the process for filing a formal complaint to John Doe;

- Defendants' employees knew John Doe was bullied and sexually assaulted in the locker room after the first event and failed to take any measures to prevent it from happening again; and

- Defendants failed to report either event to the police, John Doe's parents, and the Department of Child Services.

[Filing No. 56 at 9 (internal citations omitted).]

In their reply, Defendants argue that in their attempt to distinguish *Jauquet*, Plaintiffs mischaracterize the allegations in that case. [Filing No. 57 at 2-7.] Defendants argue that Plaintiffs here "complain[ed] of two isolated incidents that allegedly occurred two weeks apart," and do not allege that the two incidents were perpetrated by the same student "or that either perpetrator had a known history of abusing other students in general or John Doe in particular." [Filing No. 57 at 8.] They also argue that "[g]iven the abruptness of L.W.'s decision [to withdraw John Doe from Roncalli], it is hardly surprising that defendants were unable to implement whatever unspecified additional protective measures [P]laintiffs now think appropriate." [Filing No. 57 at 8.] Defendants contend that "[P]laintiffs' insistence that the severity and pervasiveness of the harassment should somehow be analyzed separately from…whether the [D]efendants' response to notice of the harassment was clearly unreasonable and amounted to deliberate indifference, is both illogical and incompatible with the case law," because whether the school's response is reasonable "depends almost entirely on the nature [of] the harassment." [Filing No. 57 at 11-12.]

Without leave of Court, Defendants also filed an inaptly titled "Notice of Supplemental Authorities Supporting Defendants' Third Motion to Dismiss," which is more properly characterized as a supplemental brief. In their "Notice," Defendants point out a Seventh Circuit decision from May 2022 which they argue indicates that there is no institutional liability based solely on knowledge of the risk of future misconduct – rather, the school official must have actual notice that misconduct rising to the level of discrimination has occurred. [Filing No. 65 at 1-2.]

Defendants also cite a United States Supreme Court case from April 2022 for the proposition that the deliberate indifference standard applies equally to Rehabilitation Act and Title IX claims.[1] [Filing No. 65 at 2.]

In their response to Defendants' Notice, Plaintiffs argue that they have adequately alleged that relevant officials had actual notice that misconduct rising to the level of discrimination based on sex and/or disability had occurred. [Filing No. 69 at 1-2.] Plaintiffs set forth additional allegations that they have discovered since the filing of their Second Amended Complaint, which they contend further support their position that Defendants knew of past misconduct by one of the students involved in the Retaliation Incident. [Filing No. 69 at 2.]

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In order to prove a discrimination claim under the Rehabilitation Act, a plaintiff must show that the defendant was deliberately indifferent to the discrimination, or that "the defendant knew that harm to a federally protected right was substantially likely and…failed to act on that likelihood." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 862 (7th Cir. 2018) (quotation and citation omitted) (finding that the deliberate indifference standard applied in Title II discrimination case and noting that "we apply precedent under [Title II] to cases involving the [Rehabilitation Act]" because Title II was modeled after section 504).

---

[1] Defendants also cite the United States Supreme Court case, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022), for the proposition that emotional distress damages are not recoverable for a Rehabilitation Act or Title IX claim. [Filing No. 65 at 2.] Since Defendants did not make this argument in their briefs supporting their Motion to Dismiss, the Court will not consider it at this time.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "To prove a Title IX sexual-harassment claim between students, a plaintiff must demonstrate that the school was 'deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 911 (7th Cir. 2020) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *see also C.S. v. Madison Metropolitan Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022) (Title IX claim succeeds only where "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the…misconduct.") (quotations and citation omitted).

Defendants argue that Plaintiffs have not adequately alleged deliberate indifference,[2] relying heavily on the Seventh Circuit's decision in *Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802 (7th Cir. 2021). There, female Student A was the victim of severe bullying by male classmate Student B and other male classmates. Over several months, Student B bullied and harassed Student A online and at school, repeatedly calling Student A degrading names and

---

[2] Defendants also argue in passing, without further elaboration, that the "two isolated incidents discussed in the second amended complaint – though regrettable – are a far cry from the sort of months-long 'severe and pervasive' harassment at issue in *Jauquet*." [Filing No. 51 at 13.] "Severe and pervasive" harassment "so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 631. The Court finds that Plaintiffs' allegations that John Doe was videotaped urinating (which was then posted on social media) and was "verbally threatened, coerced, and forced to perform sexual, embarrassing and humiliating acts against his will," including being videotaped "licking and sucking [Varsity Football Player]'s nipples," sufficiently allege "severe and pervasive" harassment.

encouraging his classmates to do the same. *Id.* at 805. This abuse continued in person and on social media, but neither Student A nor her mother initially reported it to the school because Student A feared retaliation. *Id.* Student A's mother ultimately reported the treatment to the school after discovering "sexually suggestive and vulgar posts" on Student B's social media account which were not targeted at Student A, but which concerned Student A's mother nonetheless. *Id.* Student A's mother also learned that Student B had shared explicit pictures of himself with a female student at another school. *Id.* The school principal agreed that the posts and sharing of pictures were unacceptable. *Id.* After this meeting, Student B escalated his cruel treatment of Student A, including telling his classmates that they should "buy [Student A] a rope and teach her to use it." *Id.* The school principal then met with Student A's mother and Student B's parents, but Student A's mother alleged that the principal coached Student B into giving a "rote" apology to Student A and that the suspension of Student B for the three days that fell right before winter vacation was insufficient. *Id.* at 806. Unsatisfied with the school's response, Student A's mother contacted the President of the school's operator, Green Bay Area Catholic Education, Inc., and continued to press the President to take stronger measures to protect Student A from bullying. *Id.* at 806. In response, the President sent an email to all eighth-grade boys explaining that bullying would not be tolerated and offered to move Student A's seat away from Student B. *Id.* When Student A's mother threatened to pull Student A and her sister out of the school, the President forwarded her the necessary paperwork. *Id.*

The Seventh Circuit affirmed the district court's dismissal of Student A's mother's Title IX claim, finding that the school had responded promptly to the bullying complaints and that there were no allegations that the bullying continued after the principal met with Student B and his parents. *Id.* at 808. It also noted that Student B was suspended for several days, and that school

officials met with Student A and her mother several times, offered to change Student A's seat in class, and facilitated an apology from Student B. *Id.* at 809. It further found that although Student A and her mother did not believe that the school took sufficient action, a victim "does not [have] license to demand particular remedial actions from the school." *Id.* at 809.

Defendants reliance on *Jauquet* and the egregious nature of the student conduct is misplaced. The Court's focus was on the response of school authorities. *Jauquet* and other cases that Defendants cite involved situations where the defendant took substantially more action than Plaintiffs allege was taken here. *See, e.g.,* *C.S.,* 34 F.4th at 545-47 (school entitled to summary judgment on student's Title IX claim where school's principal confronted male employee at first sign of inappropriate relationship with female student and told him to limit his contact with student, avoid interacting with her in private settings, and set strong boundaries for their relationship; and principal then observed that they appeared to interact less and she did not receive further reports of inappropriate contact); *Doe v. Sch. Dist. U-46,* 557 F. Supp.3d 860, 874-75 (N.D. Ill. 2021) (Title IX claim dismissed where principal promptly spoke to parents of students involved in repeated bullying and sexual harassment of another student, disciplined students, took steps to keep students away from victim, requested video from school bus (where some of the bullying and harassment took place), personally observed victim's classroom for several days, and provided victim with two weeks of counseling).

Here, Plaintiffs allege that Defendants essentially did nothing. The Court finds they plausibly allege that:

- Defendants knew that L.M. had been involved in multiple incidents of misconduct and bullying before the Video Incident;

- Dean Crissman assisted the student who videotaped the Video Incident with deleting the Video and deliberately chose not to watch the Video before it was deleted;

- The student who took the Video received one after-school suspension;

- The student perpetrators were not precluded from participating in any football-related events;

- Defendants took no protections and made no accommodations to ensure John Doe's safety at school or in the locker room;

- Defendants did not have a Title IX coordinator and no one contacted John Doe to discuss the Video Incident or to offer supportive measures. Defendants also failed to explain the process for filing a formal complaint to John Doe;

- Defendants' employees knew John Doe was bullied and sexually assaulted in the locker room during the Video Incident and failed to take any measures to prevent it from happening again;

- John Doe faced further abuse and harassment during the Retaliation Incident; and

- Defendants failed to report either the Video Incident or the Retaliation Incident to the police, John Doe's parents, and the Department of Child Services.

These allegations are more than sufficient to plausibly allege deliberate indifference by Defendants, given the nature of the harassment, the fact that the school facilitated the deletion of the Video, and the lack of protective measures followed by the Retaliation Incident. Additionally, Plaintiffs have sufficiently alleged that Defendants had knowledge that unlawful discrimination had occurred due to issues with L.M.'s behavior before the Video Incident, and then the Video Incident ultimately leading to the Retaliation Incident. Plaintiffs allege that both the Archdiocese and Roncalli administrators knew of these circumstances. The Court acknowledges a slight disconnect between Plaintiffs' allegations and Defendants' knowledge – specifically, that Plaintiffs do not allege that L.M. was the perpetrator in the Video Incident or even that he was involved. But because L.M. was a varsity football player and was presumably present in the Blockhouse during the Video Incident, the Court finds that Plaintiffs have plausibly alleged that Defendants

23

knew of past unlawful discrimination and were deliberately indifferent to the fact that it could occur again.

To the extent that Defendants argue that Plaintiffs' Rehabilitation Act and Title IX claims must be dismissed for failing to plausibly allege that Defendants acted with deliberate indifference to John Doe's discrimination, their Motion to Dismiss is **DENIED**.

> **B.    Whether Plaintiffs Have Adequately Alleged in Connection With Their Title IX Claim That John Doe's Harassment Was On the Basis of Sex**

Defendants argue that Plaintiffs' claim under Title IX fails because they do not allege that John Doe experienced harassment or discrimination on the basis of his sex, a necessary element of a Title IX claim. [Filing No 51 at 17.] Defendants assert that Plaintiffs explicitly allege that the harassment was based on John Doe's disability, and not his gender. [Filing No. 51 at 17.]

In response, Plaintiffs argue that they have sufficiently alleged that John Doe was discriminated against on the basis of his sex, and that they are permitted to also allege that he was discriminated against based on his disability. [Filing No. 56 at 3.] Plaintiffs contend that sexual harassment "can be perpetrated by other members of the victim's sex," as with sexually-violent hazing. [Filing No. 56 at 4.] They point to their allegations that several varsity football players "leveraged their positions of power and exploited John Doe to discriminate, bully, harass, abuse and haze him," that a Roncalli varsity football player videotaped John Doe's genitals while he was urinating and posted the video to social media, that the student showed the video to other football players in front of John Doe and they laughed at his exposed genitals, that John Doe did not consent to the videotaping, and that John Doe was again harassed and coerced to perform sexual acts against his will. [Filing No. 56 at 5-6.]

In their reply, Defendants acknowledge that the Federal Rules of Civil Procedure permit pleading in the alternative, but argue that "[P]laintiffs cannot plead any facts to render plausible

their conclusory assertion that John Doe's sex was the basis for any peer-on-peer harassment he may have experienced." [Filing No. 57 at 14.]  Defendants point to Plaintiffs' allegation that John Doe "was targeted for bullying…because he has Down Syndrome." [Filing No. 57 at 14.]

The fact that Plaintiffs allege that John Doe faced discrimination based on his disability does not foreclose a claim that he also faced discrimination based on his sex. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.")  And being subjected to hazing of a sexual nature, even when carried out by members of the same sex, can form the basis of a Title IX claim. *See, e.g.,* *Doe A v. Plainfield Comm. Cons. Sch. Dist. 202*, 2022 WL 1641684, at *3 (N.D. Ill. 2022) (allegations involving hazing practice carried out by students using pool cues to sodomize, or simulate sodomy on, younger football players created a "factual inference that the team's hazing amounted to sexual harassment contemplated by Title IX, meaning it was carried out on the basis of [the victim's] sex" and were sufficient to allege a Title IX claim, though the Court noted that "[t]he motivation behind the assaults in this case is a context-driven, fact-intensive inquiry that cannot be resolved on the pleadings alone") (quotation and citation omitted).

The Court finds that Plaintiffs have alleged sufficient factual matter – including that Roncalli students videotaped John Doe's genitals and forced him to engage in sexual acts with football players – which, when taken as true, create a plausible inference that John Doe faced discrimination on the basis of his sex.  To the extent that Defendants argue that Plaintiffs' Title IX

claim should be dismissed for failure to adequately allege that the harassment John Doe may have

experienced was based on sex as required under Title IX, their Motion to Dismiss is **DENIED**.[3]

## IV.
### CONCLUSION

The Court finds that Plaintiffs have adequately alleged that John Doe faced discrimination

on the basis of his sex, and that Defendants were deliberately indifferent to that discrimination.

Accordingly, Defendants' Motion to Dismiss, [50], is **DENIED**.  The Court requests that the

Magistrate Judge confer with the parties as soon as practicable regarding a possible resolution of

this case short of trial.

Date: 6/21/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

---

[3] The Court need not consider Defendants' remaining arguments – that the Court should dismiss
Plaintiffs' Rehabilitation Act and Title IX claims with prejudice and decline to exercise
supplemental jurisdiction over the state law claims – because it has found that Plaintiffs have
adequately alleged their Rehabilitation Act and Title IX claims.

26